**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Richard Steven Reiss, ) | No. CV 09-1760-PHX-RCB (ECV) |
| Plaintiff, ) | |
| vs. ) | **ORDER** |
| Karl Stansel, et al., ) | |
| Defendants. ) | |

Plaintiff Richard Steven Reiss filed this *pro se* civil rights action pursuant to Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388 (1971), against employees of the Eloy Detention Center (EDC), a private prison facility of Corrections Corporation of America (CCA). (Docs. 1, 8.) Plaintiff's action arose out of the failure to provide him a kosher diet, access to Jewish religious services, access to congregate services in the facility chapel, and access to a Torah and Siddur (prayer book) while at EDC. (Doc. 8 at 3-A.) The remaining Defendants—Karl Stansel, former Assistant Warden at EDC, and Niles Behrens, Chaplain at EDC—move for summary judgment on the grounds that they did not burden Plaintiff's sincerely held religious beliefs on a tenet central to Judaism, they committed no equal protection violations, and Plaintiff cannot prove damages or entitlement to injunctive relief. (Doc. 93.)

///

///

The motion is ready for ruling.[1] (Docs. 111, 123.)

The Court will grant the motion in part and deny it in part.

## I. Motion for Summary Judgment

### A. Legal Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, which it believes demonstrate the absence of a genuine issue of material fact. Id. at 323.

If the moving party meets its initial responsibility, the burden shifts to the opposing party who must demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 250; Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); see Triton Energy Corp. v. Square D. Co., 68 F.3d 1216, 1221 (9th Cir. 1995). Rule 56(c) provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." The opposing party need not establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

When considering a summary judgment motion, the court examines the pleadings,

---

[1] The Court provided Plaintiff notice pursuant to Rand v. Rowland, 154 F.3d 952, 960 (9th Cir. 1998), regarding his obligation to respond. (Doc. 97.)

depositions, answers to interrogatories, and admissions on file, together with the affidavits or declarations, if any. See Fed. R. Civ. P. 56(c). The judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. The evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255. But, if the evidence of the non-moving party is merely colorable or is not significantly probative, summary judgment may be granted. Id. at 248-49.

### B. Parties' Contentions

#### 1. Defendants

In support of their motion, Defendants submit their Amended Statement of Facts (Doc. 95, DSOF), affidavits, and various exhibits.

Plaintiff was an ICE detainee at CCA. (Id. DSOF ¶ 2.) Plaintiff was housed at EDC between September 2007 and June 2008, and again from April 2009 through much of January 2010. (Id. ¶ 2-3.) When Plaintiff entered EDC, he was the only detainee claiming to be Jewish. (Id. ¶ 4.) Defendants are not experts in Judaism, so they deferred to the expertise of Rabbi Hayman, the contract rabbi serving EDC, to determine the nature and extent of religious exercise to be afforded to Plaintiff. (Id. ¶ 5.) Defendants assert that when Rabbi Hayman first interviewed Plaintiff at EDC, Plaintiff told Rabbi Hayman that he was not Jewish and that during later conversations with Rabbi Hayman, Plaintiff maintained the same. (Id. ¶¶ 9-10.) They argue there is also no dispute that Plaintiff does not believe in organized religion. (Id. ¶ 11.) Rabbi Hayman attests that he interviewed Plaintiff twice and determined that Plaintiff "is not considered Jewish according to the Code of Jewish Law" and "is not required to practice any of Jewish laws or customs such as kosher dietary laws, shabbat and holidays etc."; Hayman so informed Behrens in letters dated October 9, 2007, and May 6, 2009. (Hayman Aff. ¶¶ 13-14; Stansel Aff., Attach. A.)

Defendants assert that weekly Jewish congregate services were not offered to Plaintiff at EDC because there was no Jewish detainee congregation. (DSOF ¶ 18.) Rabbi Hayman, was not available to provide Sabbath services at EDC because he led Sabbath services at his

own Temple and additionally was not permitted by his religion to drive to EDC on the Sabbath. (Id. ¶ 20.) According to Defendants, Plaintiff was free to practice his religion in many other ways; he was permitted to pray in his cell, in the dayroom, in the recreation yard, in the chow hall, and in any common area of the facility. (Id. ¶ 21.) When Plaintiff was not in general population, he was provided the religious materials to allow him to continue to practice his faith. (Id. ¶ 22.) He was not denied access to EDC's chapel while detained. (Id. ¶ 25.) Even if he could establish he was denied chapel access, Plaintiff admits that Judaism does not require chapel visits. (Id. ¶ 26.) Defendants also assert that Plaintiff concedes that he was not prohibited from praying in his cell or in the common areas. (Id. ¶ 27.)

Defendants argue that they denied Plaintiff's kosher meal request because Rabbi Hayman determined that Plaintiff was not Jewish. (Id. ¶ 30.) Kosher meals are only provided to Jewish detainees/inmates. (Id. ¶ 31.) Defendants argue that cost is a concern and that to allow non-Jewish inmates to demand kosher diets would permit detainees/inmates to manipulate services, changing their religious preferences and meal preferences upon whim. (Id. ¶ 32.)

According to Defendants, Plaintiff admits he can practice Judaism without a Torah and that the practice of Judaism does not require a Siddur. (Id. ¶¶ 44-45.) In addition, religious texts at EDC are provided to the detainee/inmate population through donations. (Id. ¶ 46.) When Plaintiff arrived at EDC there were no Jewish inmates, and EDC did not possess the religious texts Plaintiff requested. (Id. ¶ 47)

Defendants assert that on two occasions, Plaintiff stopped eating, engaging in a hunger strike. (Id. ¶ 51.) For Plaintiff's safety and to prevent any injury to himself, Public Health Services, a branch of Homeland Security, placed Plaintiff under medical observation to monitor his food and drink intake. (Id. ¶ 52.) When Plaintiff presented no further risk of injury, he was released to general population. (Id. ¶ 53.) Placement in medical observation was based upon the facility's legitimate penological interest in maintaining Plaintiff's health and safety due to his refusal to eat, and not in retaliation for Plaintiff's claimed religion. (Id. ¶ 54.)

According to Defendants, Plaintiff admits that he has no evidence that Defendants demonstrated an intent to discriminate against him. (Id. ¶ 56.)

### 2.     **Plaintiff**

In Opposition, Plaintiff presents his Response (Doc. 111), his affidavit, and exhibits.

Plaintiff asserts that he has demonstrated the sincerity of his religious beliefs, for example when he chose to go without eating for 10 days rather than eat non-kosher foods, and that Defendants made no attempt to determine the sincerity of his beliefs. (Doc. 111 at 6.)

Plaintiff denies stating that he was not Jewish or not born into the Jewish faith. (Id. at 1.) He claims there was at least one other Jewish person detained at EDC when Plaintiff first entered. (Id.) Plaintiff asserts that he is not aware of a divine commandment to attend congregate services but they were provided for other religions. (Id. at 2.) Plaintiff argues that Defendants cannot say from one day to the next how many Jewish detainees will be housed at EDC and whether one detainee or 20 wanted to attend congregate services, the cost to the facility—one officer—would be the same. (Id.) He maintains that Defendants are misstating Plaintiff's preference for praying in a small intimate group and asserts that he studied Judaism on his own. (Id.)

According to Plaintiff, Behrens repeatedly told Plaintiff that he could have whatever service he wanted in his cell. (Id.) Plaintiff submitted numerous requests to use the chapel but was told to hold his service in his cell. (Id.) Behrens only provided a Christian Bible when Plaintiff was in segregation. (Id. at 2-3.) Due to Behrens' hostility to the Jewish religion, Plaintiff could not turn to him for spiritual advice. (Id. at 3.) Plaintiff was denied a rabbi on more than one occasion while he was in segregation and prohibited from contacting a rabbi.

As to the religious diet, Plaintiff argues that kosher meals are provided to Muslims and Seventh Day Adventists, so the notion that cost is a concern fails as does the idea that detainees would frequently change their religious preferences because, according to Plaintiff, inmates must wait 30 days. (Id. at 3-4.) Plaintiff opines that preparation of kosher diet meals

- 5 -

should require less effort to prepare because kitchen workers would not be engaging in unnecessary processing of food—items would be washed and placed on a tray. (Id. at 4.) There are generally fewer than three Jewish detainees at EDC at any one time. (Id.) Plaintiff argues that he is indigent and cannot purchase kosher foods, although he concedes that he sometimes purchased non-kosher items. (Id.)

The commandment to study the Torah cannot be fulfilled without access to a Torah and it is not possible to perform traditional worship services without a Siddur. (Id.) EDC possessed multiple copies of two different Siddurs.

Plaintiff was not engaged in a hunger strike but rather on a 48-hour fast for religious reasons and only refusing to eat non-kosher foods, and he was never at risk of injuring himself. (Id.)

Plaintiff denies that he has no evidence that Defendants intended to discriminate against him saying that he admits only that they never verbalized an intent. (Id.)

### 3. Reply

Defendants argue that Plaintiff's assertion that he did not tell Rabbi Hayman that he is not Jewish is immaterial because Behrens and Stansel relied on the Rabbi's determination that Plaintiff is not Jewish and was, therefore, not required to follow the tenets of Judaism, such as a kosher diet. And even if Plaintiff were a member of the Jewish faith, his admissions and conduct demonstrate that his alleged beliefs are not sincerely held. (Doc. 123 at 2.)

In addition, Defendants argue that Plaintiff was permitted to engage in religious expression, such as receiving and studying religious texts and correspondence, and Plaintiff does not dispute that he was provided with alternative means of obtaining a kosher diet through the non-kosher food items available for purchase in the commissary. (Id.) Plaintiff does not dispute that because Defendants are not experts in Judaism, they reasonably deferred to a rabbi's knowledge of Judaism to determine the extent of religious exercise Plaintiff required. (Id. at 3.) Plaintiff's admissions demonstrate that his alleged beliefs in Judaism are not sincerely held. According to Defendants, Plaintiff admits that he did not

attend Jewish congregate services at Temple before he was detained, that he does not need a rabbi to tell him how to practice his alleged faith, and that he willfully consumed non-kosher food and did not keep a kosher kitchen before he was detained. (Id.)

They reiterate their arguments made in the motion.

**C.     Analysis**

The Court will grant Defendants' motion in part and deny it in part.

### 1.     Free Exercise

To prevail on a First Amendment, free-exercise-of-religion claim, a plaintiff must show that a defendant burdened the practice of plaintiff's religion by preventing him from engaging in a sincerely held religious belief and that the defendant did so without any justification reasonably related to legitimate penological interests. Shakur v. Schriro, 514 F.3d 878, 884-85 (9th Cir. 2008). Regulations that impinge on the First Amendment right to free exercise may be upheld only if they are reasonably related to legitimate penological interests. Turner v. Safley, 482 U.S. 78, 89 (1987). This determination requires analysis of four prongs: (1) there must be a valid, rational connection between the regulation and the legitimate governmental interest; (2) whether there are alternative means of exercising the right that remain open to inmates; (3) the impact accommodation of the right will have on guards and other inmates, and on the allocation of prison resources; and (4) the absence of ready alternatives. Id. at 90.

#### a.     Sincerely Held Beliefs

Defendants appear to make two arguments as to the sincerely-held belief requirement: that they relied on Rabbi Hayman's determination that Plaintiff is not Jewish and that Plaintiff's admissions and conduct demonstrate that his beliefs are not sincerely held.

As to the reliance on Rabbi Hayman's determination, the Rabbi's letter states that Plaintiff is not considered Jewish "according to the Code of Jewish Law." The Rabbi attests that traditional Jewish law defines a Jew as one who is born of a Jewish mother or who has been properly converted to Judaism. (Hayman Aff. ¶ 6.)  He describes conversion as a difficult and lengthy process, which includes a commitment to observe the basic tenets of

Judaism and confirmation by a rabbinic court consisting of three rabbinic authorities. (Id. ¶¶ 7-8.) He further attests that it is customary not to perform conversions for inmates in correctional or detention facilities. (Id. ¶ 9.)

It is the sincerity of one's belief rather than its centrality to one's faith that is relevant to the free-exercise inquiry, and it is improper to focus on whether the belief in question is required. Shakur, 514 F.3d at 884-85. As the Supreme Court has stated "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." Id. at 884 (quoting Hernandez v. Comm. of Internal Revenue, 490 U.S. at 699, 109 (1989)). "The right to the free exercise of religion is . . . the right of a human being to respond to what that person's conscience says is the dictate of God." Ward v. Walsh, 1 F.3d 873, 876 (9th Cir. 1993).

In Jackson v. Mann, the Second Circuit rejected a district court's reliance on a rabbi's determination that an inmate was not Jewish for purposes of a prison's kosher-diet program; the Second Circuit reasoned that whether an inmate's beliefs are entitled to First Amendment protection turns on whether those beliefs are sincerely held, not on an ecclesiastical question whether the inmate is a Jew under Jewish law. 196 F.3d 316, 320-21 (2nd Cir. 1999). Here, it appears that Rabbi Hayman was not assessing the sincerity of Plaintiff's belief but rather reaching an ecclesiastical determination under the Code of Jewish Law. For purposes of this motion, the Court rejects Defendants' reliance on Rabbi Hayman's determination that Plaintiff is not Jewish to justify denial of a kosher diet and the other issues.

As to the alleged lack of sincerely held beliefs, Defendants rely on EEOC v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico, where the court found that the sincerity of a Seventh-Day Adventist's beliefs was suspect because he lied on an employment application, was divorced, worked five days a week instead of six, and took an oath before a notary public—actions inconsistent with his professed religious beliefs. 279 F.3d 49, 56-57 (1st Cir. 2002). The court held that the defendant had raised a triable issue of fact. Id. at 57. But the court also noted that the finding of sincerity generally depends on the factfinder's assessment of the plaintiff's credibility and that "[c]redibility

- 8 -

issues such as the sincerity of [a plaintiff's] religious belief are quintessential fact questions. As such, they ordinarily should be reserved 'for the factfinder at trial, not for the court at summary judgment.'" Id. at 56 (internal citations omitted). Likewise, in Patrick v. LeFevre, the Second Circuit reasoned that scrutiny of a prisoner's sincerity is a means of "differentiating between beliefs that are held as a matter of conscience and those that are animated by motives of deceptions and fraud." 745 F.2d 153, 157 (2d Cir. 1984). The court emphasized that courts are "singularly ill-equipped to sit in judgement on the verity of an adherent's religious beliefs" and held that summary judgment was inappropriate because the subjective issue of sincerity of belief was a question of fact; "assessing a claimant's sincerity of belief demands a full exposition of facts and the opportunity for the factfinder to observe the claimant's demeanor during direct and cross-examination." Id.

In support of their argument that Plaintiff's beliefs are not sincerely held, Defendants cite Plaintiff's "admissions" that he is not Jewish, that he does not believe in organized religion or attend congregate Jewish services and there is no commandment to do so, that he believes rabbis are just people who have formally studied the Torah, that he purchased and ate non-kosher foods, and that he has practiced his religion without a Torah. (Doc. 93 at 7-8; Doc. 123 at 3-6.)

The Court believes that Defendants have mischaracterized parts of Plaintiff's testimony regarding his "admissions" and appear to be improperly judging the "correctness" of his beliefs or whether his beliefs are central tenets of Judaism. Plaintiff asserts that he did not tell Rabbi Hayman that Plaintiff is not Jewish. Indeed, although Defendants characterize Plaintiff's deposition testimony as stating that he was not born into the Jewish faith, in fact, Plaintiff testified that his mother and father were Jewish but not very religious and that he did not believe that he was required to convert to Judaism because he was Jewish based on his lineage. (Doc. 95, Ex. 1, Pl. Dep., Jan. 12, 2011, 15:6-7, 17-19; 21:24-22:4.)

Defendants assert that Plaintiff admits that he is not familiar with the Seven Laws of Noah. (Doc. 93 at 3.) But sincerity of beliefs does not turn on an inmate's objective knowledge of his religion. See Colvin v. Caruso, 605 F.3d 282, 298 (6th Cir. 2010). At his

deposition, Plaintiff was asked how often he went to temple as he began practicing his religion in his mid-20's, and he responded that he was not a "fan of praying in a temple with a bunch of people" he did not know but that he met with other friends and prayed in a smaller, less formal environment. (Doc. 95, Pl. Dep. 25:7-13, 20-21.) Defendants note that Plaintiff believes that "rabbis are just people who have studied formally the Torah and the religion," that "ultimately it comes down to the individual and what he's going to believe," and that there is no commandment stating that a Jewish person must attend congregate services. (Doc. 93 at 7.) For summary judgment purposes, these statements are insufficient to establish the insincerity of Plaintiff's beliefs.

Defendants also claim that Plaintiff "admits" that he can practice Judaism without a Torah or Siddur. (Doc. 93 at 5.) In fact, Plaintiff asserts that the commandment to study the Torah cannot be fulfilled without access to a Torah. (Doc. 111 at 5.) In addition, although Plaintiff testified that Judaism does not require a Siddur, he also testified that a Siddur is a prayer book and each service is a collection of prayers recited in a certain order. (Doc. 95, Pl. Dep. 131:14-132:3.) He further attested that there is no requirement to recite each prayer but that an individual would select prayers significant to him. (Id.) Plaintiff also testified that a separate chapel is not required, but that he wanted to pray in the chapel to be free of distractions, such as television or horseplay, common in such places as the pod or his cell. (Id. 80:12-16; 81:1-10.) That a Torah, Siddur, or chapel may not be required or central tenets of the religion is not the issue.

As to the kosher diet, Plaintiff testified that prior to his mid-20's when he became more religious and observant, he ate pork but that in the last five or six years he had made a conscious effort to refrain from eating non-kosher foods. (Doc. 95 Pl. Dep. 64:5-12, 22-25.) Defendants point out that Plaintiff, at some point, ate at non-kosher restaurants and that he purchased non-kosher foods in the Commissary, but Plaintiff argues that the commissary purchases were not for his personal consumption. (Doc. 111 at 4.) He also acknowledges that he occasionally ate non-kosher foods, which was followed by repentance. (Id. at 6.) Plaintiff also states that he did not engage in a hunger strike and that he fasted for religious

reasons and refused to eat non-kosher food. (Id. at 5.) Moreover, Plaintiff asserts that he began receiving the EDC kosher diet in August 2009, and Defendants do not deny this. (Doc. 8 at 5-D; Doc. 111, Pl. Aff. ¶ 21.)

The Court finds that Plaintiff professes to have a sincere belief in his need to abide by kosher dietary laws, worship in a chapel, and use a Torah and Siddur and that he provides sufficient indicia of sincerity—his studies, his worship with friends, his efforts to adhere to a kosher diet—to create a triable issue of fact as to the sincerity of his beliefs.

### b. Legitimate Penological Justification

Defendants' justification for refusing to provide Plaintiff a kosher diet is that they reasonably restrict kosher meals to those inmates with a sincerely held belief that they must adhere to a kosher diet. However, as noted above the Court will deny Defendants' summary judgment on the issue of Plaintiff's sincerely held belief. Defendants also suggest that Plaintiff can purchase kosher foods in the commissary. But "[i]nmates . . . have the right to be provided with food sufficient to sustain them in good health that satisfies the dietary laws of their religion." Shakur, 514 F. 3d 878; Ashelmen v. Wawrzaszek, 111 F.3d 674, 677 (9th Cir. 1997) McElyea v. Babbit, 833 F.2d 196, 198 (9th Cir. 1987). On this record, Defendants' argument as to the kosher diet fails.

As to the congregate worship, Defendants have provided evidence that there were no other Jewish detainees requesting congregate services; in fact, there were often no other Jewish inmates or detainees. Although Plaintiff alleges there were other Jews at EDC, elsewhere he says there were never more than three. (Doc. 111 at 7, 4.) He argues that the fact that someone does not request a religious service does not mean that he does not want to attend one. (Id. at 7.) But Plaintiff is merely speculating that there were other Jewish inmates or detainees with whom he could have congregate services and who wanted congregate services, and his speculation is insufficient to defeat summary judgment on this issue. See Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). The Court will grant summary judgment on the claim for denial of congregate services.

There is a dispute of fact regarding whether Plaintiff was denied use of the chapel for

- 11 -

private worship. Behrens attests that Plaintiff was permitted to use the chapel (Doc. 93, Ex. 4, Behrens Aff. ¶ 23), but Plaintiff claims he was told to worship in his cell. Defendants also argue that Plaintiff admitted that Judaism does not require chapel visits and that he was able to pray in his cell or the common areas and to meet with or write to religious leaders. (Doc. 93 at 4.)

Viewing the facts in the light most favorable to Plaintiff, the Court assumes that Plaintiff could not use the chapel. Applying the <u>Turner</u> test, it is not clear that there were alternative means for Plaintiff to practice his religion—the second <u>Turner</u> factor. Plaintiff was denied a kosher diet, and he argues that prayer in his cell or the common room was difficult due to distractions. Unlike inmate Shakur, who was denied a Halal diet but who could participate in other rituals and ceremonies of his faith, <u>Shakur</u>, 514 F.3d at 885-86, it does not appear that Plaintiff could do so because there were no other Jewish detainees, and Plaintiff disputes that he had a Torah or prayer book. Defendants assert that Plaintiff was free to attend the religious services of other faiths, but they cite no authority holding that attending services of another faith satisfies an alternative means to practice *Plaintiff's* religion. (Doc. 93, Ex, 3, Stansel Aff. ¶ 38.) They claim Plaintiff was free to meet with a rabbi (Doc. 123 at 7), but the contract rabbi had determined that Plaintiff was not Jewish. There is no evidence as to the impact of the accommodation on guards and other inmates. <u>See</u> <u>Shakur</u>, 514 F.3d at 886-87. Moreover, according to Plaintiff, EDC has been providing Sabbath services in the chapel since Plaintiff returned in February 2011.[2] (Doc. 111 at 8.) On the record before it, the Court must deny Defendants' request for summary judgment on this issue.

Regarding the religious texts, Defendants assert that they acquire religious texts

---

[2]It is unclear whether the services to which Plaintiff refers are congregate services or private worship. Defendants object to Plaintiff's exhibit regarding the schedule of services on grounds of hearsay, relevance (different time periods than those at issue), and lack of foundation. (Doc. 122, II.) But Defendants do not deny that they have been providing such services. In addition, even without the evidence, the Court would reach the same conclusion regarding Plaintiff's alternative means to practice his religion.

- 12 -

through donations and that they did not have a Torah when Plaintiff arrived. (Doc. 93, Ex. 3, Stansel Aff. ¶¶ 39, 42.) Behrens attests that Plaintiff was provided a Siddur and when EDC was able to obtain a Torah, it was provided to Plaintiff. (Id., Ex. 4, Behrens Aff. ¶ 19.) They allege that Plaintiff was free to arrange for donation on his own and at some point Plaintiff received a Torah and Siddur from a friend. (Id. ¶ 20.) Stansel attests that in February 2008, Plaintiff filed a grievance about requests for a Torah and that Behrens responded that one was ordered on February 28, 2009,[3] and would be loaned to Plaintiff when available. (Id., Ex. 3, Stansel Aff. ¶¶ 17-18.) Stansel further attests that Plaintiff filed another grievance on April 28, 2009 regarding the requests for a Torah and Siddur. (Id. ¶ 21.)

Defendants argue that spending facility resources on religious texts when there were no Jewish inmates would put a strain on facility resources. (Doc. 93 at 12.) The Court finds there is a rational nexus between the religious-text policy and legitimate penological concerns. See Turner, 482 U.S. at 90. But Defendants offer little explanation regarding what they actually did to acquire the texts. And because Plaintiff was again grieving the issue a year after the Torah was reportedly ordered, there appears to be a long period of time—at least a year—between ordering the text and acquiring it. Moreover, the April 2009 grievance and appeal, which sought the texts and a kosher diet, were denied in their entirety because the authority on Jewish religion had determined that Plaintiff was not Jewish. (Id., Ex. 3, Attach. E.) Defendants also assert that Plaintiff received religious texts from a friend in April 2008. (Doc. 95 DSOF ¶ 49.) But the Behrens affidavit to which they point, does not, in fact, say when Plaintiff received the texts. (See Doc. 93, Ex. 3, Behrens Aff. ¶ 20.) Thus, the record does not show when Plaintiff actually received a Torah or Siddur or was able to use one provided by Defendants. In addition, as noted above, it is not clear that there were alternative means for Plaintiff to practice his religion. The Court finds there is insufficient evidence on the Turner factors to determine if there was a legitimate penological justification regarding the denial of a Torah and Siddur.

---

[3] The Court assumes this date should be February 28, 2008.

As to the allegations that Plaintiff was improperly placed in medical observation, the Court finds that Plaintiff fails to state a claim against either Stansel or Behrens. In his First Amended Complaint, Plaintiff alleged that after fasting from October 19 to October 20, 2007, he was ordered to segregation by Correctional Counselor John Kalberer. (Doc. 8 at 3, 3B.) Likewise, on May 1, 2009, after eating nothing for 10 days, he was sent to medical observation. (Id. at 5D.) There are no allegations to connect Stansel or Behrens to either incident.

### 2. Equal Protection

The Fourteenth Amendment Equal Protection Clause requires the State to treat all similarly situated people equally and entitles each prisoner to "a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." Shakur, 514 F.3d at 891 (9th Cir. 2008) (internal citations omitted). To show a violation under the Equal Protection Clause, a plaintiff must demonstrate that the defendant acted with a discriminatory intent or purpose that was based upon the plaintiff's membership in a protected class. Serrano v. Francis, 345 F.3d 1071, 1082 (9th Cir. 2003). He "'must set forth specific facts showing that there is a genuine issue' as to whether he was afforded a reasonable opportunity to pursue his faith as compared to prisoners of other faiths" and that "officials intentionally acted in a discriminatory manner." Freeman v. Arpaio, 125 F.3d 732, 737 (9th Cir. 1997), abrogated on other grounds by Shakur, 514 F.3d at 884-85. Taking from Turner, the Court must consider whether "the difference between the defendants' treatment of [Plaintiff] and their treatment of [other] inmates is 'reasonably related to legitimate penological interests.'" Shakur, 514 F.3d at 891 (citing DeHart v. Horn, 227 F.3d 47, 61 (3rd Cir. 2000)). A mere rational basis for disparate treatment of inmates of different religious faiths is not sufficient. Id.

Defendants argue that with regard to Plaintiff's equal protection claim, the appropriate comparison is to other inmates falsely claiming to be Jewish or to Jewish detainees, not with members of Christianity and Islam. (Doc. 93 at 13; Doc. 123 at 10.) The Court disagrees. See Shakur, 514 F.3d at 891(comparing the treatment of Jewish inmates to that of Muslim

- 14 -

inmates).

The Court will deny Defendants' request for summary judgment on Plaintiff's equal protection claims. For the reasons discussed above, the Court finds that there are either disputed issues of fact or the record is not sufficiently developed to assess the Turner factors. The Court notes that with the exception of Stansel's averment that EDC requires religious texts through donation and that EDC did not have a Torah when Plaintiff arrived, which suggests that EDC has other religious texts, Defendants do not provide any evidence regarding how they treat inmates and detainees of other religions.

### 3.     Damages and Injunctive Relief

Defendants argue that the individual-capacity claims must be dismissed because Plaintiff has failed to demonstrate that either Defendant substantially burdened a central tenet of Plaintiff's faith or violated his right to equal protection. (Doc. 93 at 14.) For the reasons discussed above, the Court rejects this argument.

The Court will dismiss Plaintiff's official-capacity claims against Defendants. (See id. at 15.) In an official-capacity suit, the plaintiff must demonstrate that a policy or custom of a governmental entity, of which the defendant official is an agent, was the moving force behind the violation. Hafer v. Melo, 502 U.S. 21, 25 (1991). Defendants are employees of CCA, a private corporation; CCA is not a governmental entity, and Defendants are not state officials merely because they were acting under color of state law.

The Court will not dismiss the claims for injunctive relief. Defendants' argument was premised on Plaintiff's transfer from EDC to the Maricopa County Jail. (Doc. 16-17.) But Plaintiff has returned to EDC. Moreover, although Plaintiff is now receiving a kosher diet and can apparently attend worship services, Defendants argue that his beliefs are not sincerely held. A voluntary change in policy renders a claim moot only if it is "'a permanent change' in the way [the defendant does] business and [is] not a 'temporary policy that the [defendant] will refute once this litigation has concluded.'" Smith v. Univ. of Wash., Law Sch., 233 F.3d 1188, 1194 (9th Cir. 2000) (quoting White v. Lee, 227 F.3d 1214, 1243 (9th Cir. 2000)).


**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 93).

(2) Defendants' Motion for Summary Judgment (Doc. 93) is **granted in part and denied in part as follows:**

    (a) **granted** as to the claim for denial of congregate services and all official-capacity claims; and

    (b) **denied** in all other respects.

(3) The remaining claims are the free exercise and equal protection claims for damages and injunctive relief regarding denial of a kosher diet, denial of access to the chapel, and denial of a Torah and Siddur.

DATED this 24th day of May, 2011.

_____
Robert C. Broomfield
Senior United States District Judge